**UNITED STATES DISTRICT COURT**
**FOR DISTRICT OF MINNESOTA**

| | |
|---|---|
| KAYLA HARRIS and STEPHANIE BRAULICK, individually, and on behalf of those similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>GILLETTE CHILDREN'S SPECIALTY HEALTHCARE, a Minnesota nonprofit corporation,<br><br>Defendant. | Case No. 24-cv-01687<br><br>Judge Katherine M. Menendez |

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS**

**ALMEIDA LAW GROUP LLC**
David S. Almeida
849 W. Webster Avenue
Chicago, Illinois 60614
(312) 576-3024
david@almeidalawgroup.com

**ZIMMERMAN REED LLP**
Hart L. Robinovitch
14648 North Scottsdale Road, Suite 130
Scottsdale, AZ 85254
Telephone: (480) 348-6400
hart.robinovitch@zimmreed.com

## TABLE OF CONTENTS

INTRODUCTION ....................................................................................................1

FACTUAL BACKGROUND ....................................................................................1

LEGAL STANDARD ..............................................................................................3

ARGUMENT ..........................................................................................................5

I. PLAINTIFFS HAVE STANDING TO ASSERT CLAIMS FOR UNLAWFUL DISCLOSURE OF THEIR CHILDREN'S HEALTH INFORMATION. ..........................5

II. THE HHS GUIDANCE HAS BEEN VACATED ONLY IN PART IN A MANNER THAT DOES NOT AFFECT PLAINTIFFS' ALLEGATIONS. .......................................7

III. PLAINTIFFS' COMPLAINT DOES NOT VIOLATE RULE 8. ....................................11

IV. PLAINTIFFS' CLAIMS SURVIVE A MOTION TO DISMISS.. ..................................14

A. Plaintiffs Plausibly Allege an ECPA Claim.............................................................14

1. Plaintiffs Allege that Defendant Intercepted the Contents of their Communications. ....................................................................................14

2. The One-Party Exception Does Not Apply Because Plaintiffs Allege that Gillette Committed a Crime or Tort......................................................................16

a. Plaintiffs Allege a Criminal or Tortious Purpose to Violate HIPAA, the MUDTPA, and Commit an Invasion of Privacy.......................................17

b. Plaintiffs Plead an Independent Tort or Crime. ........................................21

c. Plaintiffs Allege a Contemporaneous Tortious or Criminal Purpose.........23

d. Plaintiffs Pled that Gillette Intended to Harm them.................................23

3. Plaintiffs State a Claim for Procurement and Use...............................................24

4. Factual Questions should not be Resolved on a Motion to Dismiss. ...................26

B. Plaintiffs Allege Invasion of Privacy Stemming from Defendant's Intrusive use of Tracking Technologies that are Highly Offensive to a Reasonable Person…………27

1. Plaintiffs Allege that Defendant Committed an Intrusion.. ................................27

2. Defendant's Conduct was Highly Offensive... .....29

C. Plaintiffs Plead all Elements of a Negligence Claim.....31

D. Plaintiffs State a Claim for Breach of Implied Contract.....34

E. Plaintiffs Properly Allege Unjust Enrichment. .....35

F. Plaintiffs Properly Allege Violation of the MUDTPA. .....38

1. Plaintiffs plausibly allege deceptive statements. .....38

2. Plaintiffs allege a causal nexus. .....39

3. Plaintiffs allege that they are likely to suffer future harm. .....41

4. Plaintiffs' MUDTPA claim is not moot. .....42

CONCLUSION.....43

# TABLE OF AUTHORITITES

**Page(s)**

**Cases**

*Already, LLC v. Nike, Inc.*,
568 U.S. 85 (2013) .... 42

*American Hospital Association v. Becerra*,
2024 WL 3075865 (N.D. Tex. June 20, 2024) .... 8, 9, 10

*Apex Digit., Inc. v. Sears, Roebuck & Co.*,
572 F.3d 440 (7th Cir. 2009) .... 4

*ASI, Inc. v. Aquawood, LLC*,
2020 WL 5913578 (D. Minn. Oct. 6, 2020) .... 13

*Barclay v. Icon Health & Fitness*,
2020 WL 6083704 (D. Minn. Feb. 17, 2022) .... 41, 42

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) .... 4

*Bell v. Am. Accts. & Advisers, Inc.*,
2018 WL 6718573 (D. Minn. Nov. 15, 2018) .... 12

*Boseovski v. McCloud Healthcare Clinic, Inc.*,
2020 WL 68578 (E.D. Cal. Jan. 7, 2020) .... 25

*Brahm v. Hosp. Sisters Health Sys.*,
2024 WL 3226135 (W.D. Wis. June 28, 2024) .... 11

*Buckler v. United States*,
919 F.3d 1038 (8th Cir. 2019) .... 4

*Calhoun v. Google LLC*,
526 F. Supp. 3d 605 (N.D. Cal. 2021) .... 33

*Caro v. Weintraub*,
618 F.3d 94 (2d Cir. 2010) .... 17, 21

*Chadbourne v. Walmart*,
2019 WL 4195269 (D. Minn. Aug. 8, 2019) .... 13

*Chey v. Metro. Airports Comm'n*,
2023 WL 2308272 (D. Minn. Mar. 1, 2023) .......... 38

*Christensen L. Off., PLLC v. Ngouambe*,
2018 WL 2293423 (Minn. App. May 21, 2018) .......... 35

*Cooper v. Mount Sinai Health Sys., Inc.*,
2024 WL 3586357 (S.D.N.Y. July 30, 2024) .......... 11, 18, 20

*Desnick v. Am. Broad. Companies, Inc.*,
44 F.3d 1345 (7th Cir. 1995) .......... 18

*Deteresa v. Am. Broadcasting Cos., Inc.*,
121 F.3d 460 (9th Cir. 1997) .......... 17

*Doe v. Meta Platforms, Inc.*,
690 F. Supp. 3d 1064 (N.D. Cal. 2023) .......... 15

*Doe v. Regents of Univ. of California*,
672 F. Supp. 3d (N.D. Cal. 2023) .......... 32, 35

*Doe v. Smith*,
429 F.3d 706 (7th Cir. 2005) .......... 26

*Doe v. Tenet Healthcare Corp.*,
2024 WL 1756075 (D. Mass. Apr. 23, 2024) .......... 35

*Frances v. Schudrich*,
2006 WL 8456997 (D. Md. Aug. 11, 2006) .......... 7

*Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*,
528 U.S. 167 (2000) .......... 42

*Gen. Mills Operations, LLC v. Five Star Custom Foods, Ltd.*,
703 F.3d 1104 (8th Cir. 2013) .......... 34

*Georgopolis v. George*,
54 N.W.2d 137 (Minn. 1952) .......... 35

*Hall v. Centerspace, LP*,
2023 WL 3435100 (D. Minn. May 12, 2023) .......... 33, 37

*Hudock v. LG Elecs. U.S.A., Inc.*,
2017 WL 1157098 (D. Minn. Mar. 27, 2017) .......... 41

*In re Anthem Inc. Data Breach Litig.*,
2016 WL 3029783 (N.D. Cal. May 17, 2016) .................................................... 33

*In re Gen. Mills Glyphosate Litig.*,
2017 WL 2983877 (D. Minn. July 12, 2017) .................................................... 43

*In re Google Inc. Cookie Placement Cons. Priv. Litig.*,
806 F.3d 125 (3d Cir. 2015) .................................................................... 14, 17

*In re Google, Inc. Privacy Policy Litigation*,
58 F. Supp.3d 968 (N.D. Cal. 2014) .............................................................. 30

*In re Grp. Health Plan Litig.*,
2023 WL 8850243 (D. Minn. Dec. 21, 2023) ............................................ *passim*

*In re Meta Pixel Healthcare Litig.*,
647 F. Supp. 3d 778 (N.D. Cal. 2022) ............................................... 11, 12, 18

*Kane v. Univ. of Rochester*,
2024 WL 1178340 (W.D.N.Y. Mar. 19, 2024) ........................................... 11, 19

*Kanuszewski v. Michigan Dep't of Health & Hum. Servs.*,
684 F. Supp. 3d 637 (E.D. Mich. 2023) ............................................................. 7

*Kennedy v. City of Braham*,
67 F. Supp. 3d 1020 (D. Minn. 2014) ................................................................ 29

*Knotts v. Nissan North America, Inc.*,
346 F.Supp.3d 1310 (D. Minn. 2018) ................................................................ 37

*Kurowski v. Rush Sys. for Health*,
2024 WL 3455020 (N.D. Ill. July 18, 2024) ...................................... 18, 19, 22

*Kurowski v. Rush System for Health*,
683 F. Supp. 3d 836 (N.D. Ill. 2023) ................................................................ 22

*Lake v. Wal–Mart Stores, Inc.*,
582 N.W.2d 231 (Minn.1998) ............................................................ 27, 28, 29

*Le v. Kohls Dep't Stores, Inc.*,
160 F.Supp.3d 1096 (E.D. Wis. 2016) ............................................................... 42

*Lehman v. Zumbrota-Mazeppa Pub. Sch.*,
*2005 WL 894756, at *4 (Minn. Ct. App. Apr. 19, 2005).* ..................................... 28

*Lonegan v. Hasty*,
436 F. Supp. 2d 419 (E.D.N.Y. 2006) ........................................................................ 25

*Luckey v. Alside, Inc.*,
245 F. Supp. 3d 1080 (D. Minn. 2017) ............................................................... 39, 40

*McCann v. Hy-Vee, Inc.*,
663 F.3d 926 (7th Cir. 2011) .......................................................................................... 6

*Mekhail v. N. Mem'l Health Care*,
2024 WL 1332260 (D. Minn. Mar. 28, 2024) ........................................................ *passim*

*Meredith v. Gavin*,
446 F.2d 794 (8th Cir. 1971) ........................................................................................ 23

*Meyer v. Rahn*,
2024 WL 1242236 (D. Minn. Mar. 22, 2024) ............................................................... 43

*Minnesota ex rel. Hatch v. Fleet Mortg. Corp.*,
158 F.Supp.2d 962 (D. Minn. 2001) ............................................................................ 38

*Morton v. Becker*,
793 F.2d 185 (8th Cir. 1986) .......................................................................................... 4

*Okash v. Essentia Health*
2024 WL 1285779 (D. Minn. Mar. 26, 2024) ................................................... 22, 36, 41

*Osborn v. United States*,
918 F.2d 724 (8th Cir. 1990) ...................................................................................... 3, 4

*Park v. Forest Serv. of U.S.*,
205 F.3d 1034 (8th Cir. 2000) ...................................................................................... 41

*Planned Parenthood Federation of America, Inc. v. Newman*,
51 F.4th 1125 (9th Cir. 2022) ....................................................................................... 21

*Prairie River Home Care, Inc. v. Procura, LLC*,
2018 WL 3621208 (D. Minn. July 30, 2018)................................................................ 14

*R.C. v. Walgreen Co.*,
2024 WL 2263395 (C.D. Cal. May 9, 2024)................................................................. 20

*Roth v. Life Time Fitness, Inc.*,
2017 WL 1628877 (D. Minn. May 1, 2017) .......... 36

*ServiceMaster of St. Cloud v. GAB Bus. Servs., Inc.*,
544 N.W.2d 302 (Minn. 1996) .......... 37

*Smith v. Loyola University Medical Center*
2024 WL 3338941 (N.D. Ill. July 9, 2024) .......... 11

*Song v. Champion Petfoods USA, Inc.*,
2020 WL 7624861 (D. Minn. Dec. 22, 2020) .......... 39

*Stalley v. Cath. Health Initiatives*,
509 F.3d 517 (8th Cir. 2007) .......... 3

*Stubbs v. North Mem'l Med. Cntr.*,
448 N.W.2d 78 (Minn. Ct. App. 1989) .......... 36

*Superior Edge, Inc. v. Monsanto Co.*,
44 F. Supp. 3d 890 (D. Minn. 2014) .......... 13

*Swierkiewicz v. Sorema N. A.*,
534 U.S. 506 (2002) .......... 12

*Titus v. Sullivan*,
4 F.3d 590 (8th Cir. 1993) .......... 4

*Tri-State Bobcat, Inc. v. FINN Corp.*,
338 F. Supp. 3d 971 (D. Minn. 2018) .......... 34

*United States v. Szymuszkiewicz*,
622 F.3d 701 (7th Cir. 2010) .......... 26

*Valentine v. WideOpen West Finance, LLC*,
288 F.R.D. 407 (N.D. Ill. 2012) .......... 25

**Statutes**

18 U.S.C. § 2510(8) .......... 15

18 U.S.C. § 2511(1)(d) .......... 24

18 U.S.C. § 2511(2)(d) .......... 15, 17, 18

42 U.S.C. § 1320d-6 .......... 19

Minn. Stat. §325D.45, subd. 1 .......... 37, 41

Minn. Stat. § 144.291, subd. 2(c) .......... 32

Minn. Stat. § 144.651 subd. 16 .......... 31

**Rules**

Fed. R. Civ. P. 15(a)(2) .......... 43

Fed.R.Civ.P. 8 .......... 11, 12, 13, 14

**Regulations**

45 C.F.R. § 164.502(g)(1) .......... 5

45 C.F.R. § 164.502(g)(3)(i) .......... 5

**Other Authorities**

1986 U.S.C.C.A.N. 2112 .......... 25

## INTRODUCTION

Federal and state law prohibit the unauthorized interception and disclosure of sensitive healthcare information without informed consent. In addition to violating the trust and confidence its patients and their caretakers placed in it, Gillette Children's Specialty Healthcare ("Gillette") violated these laws by secretly embedding tracking technologies on its website to intercept private communications regarding protected health information and disclosed that information Meta and Google, two of the largest AdTech companies in the world. Gillette acknowledges deploying these technologies but attempts to avoid judicial scrutiny of its actions by asserting myriad technical defects in the Complaint. Because the Complaint adequately alleges multiple violations stemming from Gillette's interception and disclosure of sensitive healthcare information, the Court should deny the motion to dismiss in its entirety.

## FACTUAL BACKGROUND

Kayla Harris and Stephanie Braulick are Minnesota residents whose young children are patients of Gillette. *See* ECF No. 2, Redacted Complaint ("Compl.") ¶¶ 14-15, 77-78 & 95. Like many parents with children who experience health issues, Plaintiffs H used Gillette's website (the "Website") to inquire about health symptoms, treatments, and physician availability. *Id.* ¶¶ 80 & 95. Gillette encouraged Plaintiffs to use its Website for healthcare purposes. *Id.* ¶ 194. Specifically, Plaintiff Harris used the Website "search" bar to search for physicians to treat her daughter's particular health condition. *Id.* ¶ 81. She also used the Website to take a health assessment for her daughter, schedule appointments,

and research her daughter's health condition. *Id.* ¶¶ 81-82. Similarly, Plaintiff Braulick used the Website "search" bar to inquire about her son's particular health condition. *Id.* ¶ 96. Plaintiff Braulick also used the Website to search for information about physicians, schedule appointments, and research her son's condition. *Id.* ¶¶ 96-97.

Unbeknownst to Plaintiffs, each time they communicated highly sensitive Personal Health Information ("PHI") and Personally Identifiable Information ("PII") (collectively "Personal Information") concerning their children's health via Gillette's Website, the communications were intercepted and transmitted to Meta and Google. *Id.* ¶ 4 & 7-8. This occurred because Gillette installed tracking technologies from Meta and Google on its Website that caused Plaintiffs' browsers to duplicate in real-time every communication with Gillette and to transmit the same information to Meta and Google, *id.* ¶¶ 47-48 & 62-64, thus disclosing the substantive health information of Plaintiffs' children, *id.* ¶¶ 65-74. Plaintiffs' Website communications were then linked to Plaintiffs' online profiles with Meta and Google through unique identifiers which Gillette (and other companies) could use to retarget Plaintiffs with health-related advertising. *Id.* ¶ 73. Following her use of the Website, Plaintiff Harris received targeted ads related to Gillette and her daughter's health condition on her Meta accounts. *Id.* ¶ 87. Plaintiff Braulick also received targeted ads related to her son's medical condition and Gillette's services on her Facebook account after visiting the Gillette Website and likewise received ads for Gillette while browsing the internet. *Id.* ¶ 102.

Plaintiffs never consented to Gillette disclosing their children's substantive health information to third-party AdTech companies. *Id.* ¶¶ 10, 86 & 101. The pop-up banner on

Gillette's Website mentioned the "use of cookies," but nothing in it revealed that Gillette disclosed substantive Personal Information—such as PHI—to Meta and Google. MTD at 2. Nor were Website visitors required to click on the banner to use the Website. *See* Decl. of Nicole Moen, Ex. A. Further, Gillette's privacy policy (the "Privacy Policy") misleadingly assured users that Gillette was "strongly committed to protecting the privacy of its online users," including "patients [and] families." Compl. ¶ 108. Gillette promised not to "collect personally identifiable information about individuals, except when it is knowingly provided by such individuals (e.g., web forms)." *Id.* Gillette further promised it would "not share voluntarily provided, personally identifiable information for any purpose other than its intended use." *Id.* The Privacy Policy also stated that Gillette would not "rent or sell visitors' personal information to third parties, such as marketers." *Id.*[1] Gillette similarly downplayed and generalized the disclosures resulting from its use of pixels and Google Analytics. *Id.* ¶¶ 110-13. Nothing in the Privacy Policy revealed that Gillette intercepted and disclosed substantive health information that Meta and Google could link to particular individuals. *See* Decl. of Nicole Moen, Ex. B.

## **LEGAL STANDARD**

A Rule 12(b)(1) motion can be brought by a party as either a "facial attack" or a "factual attack," the determination of which affects the Court's assessment of the facts. *Stalley v. Cath. Health Initiatives*, 509 F.3d 517, 520–21 (8th Cir. 2007) (citing *Osborn v.*

---

[1] The Privacy Policy also misleadingly asserted that "cookies used by Gillette Children's do not collect any personal information about a visitor, provide any way to contact a visitor, or extract any information from a visitor's computer." ¶ 109.

*United States*, 918 F.2d 724, 729 n.6 (8th Cir. 1990)). In a facial attack, a party challenges the sufficiency of the pleadings. *See Titus v. Sullivan*, 4 F.3d 590, 593 (8th Cir. 1993). "[T]he court restricts itself to the face of the pleadings and the non-moving party receives the same protections as it would defending against a motion brought under Rule 12(b)(6)." *Osborn*, 918 F.2d at 729 n.6 (internal citations omitted). Under a factual attack, the Court will go beyond the pleadings and consider extrinsic evidence in determining whether it has subject matter jurisdiction. *Id.* In such an instance, "the complaint is formally sufficient but the contention is that there is in fact no subject matter jurisdiction." *Apex Digit., Inc. v. Sears, Roebuck & Co.*, 572 F.3d 440, 444 (7th Cir. 2009) (cleaned up). Due to the unique nature of the jurisdictional question, if the Court's inquiry extends beyond the pleadings, "the court may receive evidence via 'any rational mode of inquiry.'" *Buckler v. United States*, 919 F.3d 1038, 1044 (8th Cir. 2019) (quoting *Osborn*, 918 F.2d at 730). "Once the evidence is submitted, the district court must decide the jurisdictional issue, not simply rule that there is or is not enough evidence to have a trial on the issue." *Osborn*, 918 F.2d at 730.

To withstand a Rule 12(b)(6) motion to dismiss, a complaint must contain "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). This standard does not require inclusion of "detailed factual allegations," rather the complaint must contain facts with enough specificity "to raise a right to relief above the speculative level." *Id.* at 555. Courts assume the facts alleged to be true and make all reasonable inferences from those facts in the light most favorable to plaintiffs. *See, e.g.*, *Morton v. Becker*, 793 F.2d 185, 187 (8th Cir. 1986).

# ARGUMENT

## I. PLAINTIFFS HAVE STANDING TO ASSERT CLAIMS FOR UNLAWFUL DISCLOSURE OF THEIR CHILDREN'S HEALTH INFORMATION.

When a parent communicates sensitive health information about their child to a healthcare provider and the provider discloses that information to third parties without consent, a parent has standing to assert claims based on that unlawful disclosure. Federal law recognizes that when it comes to a child's personal health information, healthcare providers must treat the child's parents as if they were the patients themselves. For instance, HIPAA regulations provide that, "[i]f under applicable law a parent, guardian, or other person acting in loco parentis has authority to act on behalf of an individual who is an unemancipated minor in making decisions related to health care, a covered entity must treat such person as a personal representative under this subchapter, with respect to protected health information relevant to such personal representation." 45 C.F.R. § 164.502(g)(3)(i). The HIPAA regulations make clear that, "a covered entity must . . . treat a personal representative *as the individual* for purposes of this subchapter." 45 C.F.R. § 164.502(g)(1). In other words, when it comes to a child's PHI, a healthcare provider must treat the parent as the patient.

The practical effect of these regulations is to put parents in the child's shoes for purposes of asserting rights related to a child's health information. That makes sense as a child does not independently communicate his or her PHI to a healthcare provider, nor does a child make unilateral decisions concerning treatment options, physicians and/or appointments. Rather, when a child receives healthcare, the parent acts as the child's voice

in communicating PHI to the provider and making healthcare decisions. *See, e.g.*, Compl. ¶ 80 (describing how Plaintiff Harris used the Website to take health assessments and make appointments for her daughter). Because parents stand in their child's shoes and are treated "as the individual" patient under federal law, it follows that parents can assert claims based on the unlawful disclosure of their child's sensitive health information.

Gillette contends that Plaintiffs lack standing because they are not patients of Gillette and Plaintiffs' own health information was not disclosed. But Gillette does not address the federal regulations outlined above that require covered entities to treat Plaintiffs as if they were the patients. Nor does Gillette explain how its position avoids putting parents in a Catch-22. In Gillette's view, if the parents bring claims to vindicate the unlawful disclosure of their child's health information, as Plaintiffs do, they lack standing. But if claims are brought by the children, as Gillette suggests is the proper course, Gillette would likely argue that the children's claims fail because the *children's* communications were not intercepted. Rather, Gillette intercepted and disclosed the *parents'* communications about their *children's* health information. Heads Gillette wins, tails the parents and children lose.[2] *Cf. McCann v. Hy-Vee, Inc.*, 663 F.3d 926, 931 (7th Cir. 2011) (observing that the law is "unlikely to countenance" a "heads I win, tails you lose, proposition").

[2] Gillette cites a Washington trial court decision dismissing a similar complaint against a children's hospital. MTD at 5 (citing *Baker v. Seattle Children's Hosp.*, Case No. 23-2-19331, Dkt. No. 21 (Wash. Sup. Ct. Feb. 23, 2024)). But that case did not involve claims under the federal wiretap statute, nor does the court's decision provide any insight into the reasons for the dismissal, *see* Decl. of Nicole Moen, Ex. D.

Contrary to Gillette's argument, parents and children are not left without a remedy for the unlawful interception and disclosure of parent communications concerning their child's healthcare needs. Federal law recognizes that parents stand in the shoes of their children for purposes of vindicating privacy rights pertaining to a child's personal health information. *Cf. Frances v. Schudrich*, 2006 WL 8456997, at *6 (D. Md. Aug. 11, 2006) (rejecting as "simply wrong" defendant's assertion that "parents lack standing to assert claims for invasion of privacy concerning their children, who are not named as parties in the suit," given that parents "can certainly claim a right to privacy that encompasses the 'intimate details' of their family life"); *Kanuszewski v. Michigan Dep't of Health & Hum. Servs.*, 684 F. Supp. 3d 637, 648 (E.D. Mich. 2023) (explaining that "parents have a duty and right to protect the privacy interests of their children's genetic information and to make informed decisions about how it is collected, stored, and used"). As their children's "personal representatives," Plaintiffs must be treated "as the individual" patient of Gillette and therefore have standing to assert the claims in the Complaint.

## II. THE HHS GUIDANCE HAS BEEN VACATED ONLY IN PART IN A MANNER THAT DOES NOT AFFECT PLAINTIFFS' ALLEGATIONS.

Gillette next argues that guidance issued by the Department of Health and Human Services Office of Civil Rights (the "HHS Guidance") has been vacated for purposes relevant here and even if it had not been vacated it cannot support Plaintiffs' claims.[3] In June 2024, the United States District Court for the Northern District of Texas issued an

[3] *See* Use of Online Tracking Technologies by HIPAA Covered Entities and Business Associates (last updated June 26, 2024), https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-online-tracking/index.html

opinion in *American Hospital Association v. Becerra*, 2024 WL 3075865 (N.D. Tex. June 20, 2024) ("*AHA*") reaffirming the HHS Guidance in part and vacating one discrete aspect not applicable to this case. Because Plaintiffs' claims are based on long-standing obligations that were not created by the HHS Guidance nor impacted by the *AHA* decision, Defendant's reliance on it is wholly misplaced.

First, Plaintiffs are not suing Defendant for violating the HHS Guidance; rather, they assert claims for violating Minnesota state law, the federal wiretapping statute, and common law. Thus, whether or not a portion of the HHS Guidance was vacated does not resolve the merits of Plaintiffs' well-pled allegations.

Second, the *AHA* opinion addresses only a single discrete issue with no bearing on Plaintiffs' claims. Specifically, Judge Pittman held that HHS exceeded its authority by issuing guidance prohibiting healthcare providers from utilizing "an online technology" that discloses (i) an individual's IP address along with (ii) a visit to an unauthenticated public webpage addressing specific health conditions or healthcare providers. *AHA*, 2024 WL 3075865 at *2. Judge Pittman labeled this "new rule" as the "Proscribed Combination." *Id.* An example of the "Proscribed Combination" would be technology that disclosed an IP address along with the fact that someone visited a website page about cancer treatment.

As Judge Pittman was careful to note, his opinion concerns *only* the "Proscribed Combination." *Id.* at *17, n. 8 ("Such vacatur is not intended to, and should not be construed as, limiting the legal operability of other guidance in the germane HHS document."). Indeed, Judge Pittman observed that the HHS guidance "contains an array of

guidance for covered entities, much of which is both legally and pragmatically sound." *Id.* at *4, n. 3. Among the "legally and programmatically sound" guidance that the *AHA* opinion endorses are specific prohibitions by HHS against each of the following:

- Deploying tracking technologies inside "user-authenticated webpages" (like patient portals);
- Deploying tracking technologies on unauthenticated webpages that "permits individuals to schedule appointments or use a symptom-checking tool;"
- Deploying tracking technologies on the unauthenticated "login page" or the "user registration page" of a patient portal;
- Deploying tracking technologies on "bill pay" functions of an unauthenticated website; or
- Deploying tracking technologies on mobile apps offered by a healthcare provider; or
- Deploying tracking technologies on unauthenticated health webpages that share personal identifiers such as patients' names, email addresses, phone numbers, or user IDs (like a Facebook ID).[4]

Contrary to Defendant's implication, this case does ***not*** concern the general public's use of unauthenticated public websites and the concomitant disclosure of their IP addresses. Rather, this case challenges Defendant's' use of tracking technologies, including the Meta Pixel, to collect and disclose PHI, such as (i) online appointments, (ii) bill payment details, (iii) patients' health conditions, symptoms and possible treatments and (iv) completion of health assessments. *See, e.g.*, Compl. ¶¶ 5, 60, 80, 82 & 95. Plaintiffs also allege that, via tracking technologies, Defendant disclosed such information as the type of appointment and medical provider associated with a patient's appointment, as well as their patient status,

[4] *See* Use of Online Tracking Technologies by HIPAA Covered Entities and Business Associates, *supra,* n. 2.

to third parties. *Id.* ¶ 69. The *AHA* decision does not undermine the HHS Guidance prohibiting such disclosures, let alone suggests that such disclosures do not violate HIPAA. Indeed, it recognizes that such disclosures *would* reveal PHI and HHS "[c]an and should remind covered entities that the Privacy Rule would apply in those circumstances." 2024 WL 3075865, at *14.

*AHA* is thus consistent with Plaintiffs' position that covered entities—such as Defendant—may *not* use tracking technologies to collect and to disclose information protected under HIPAA's Privacy Rule to third parties. Defendant's obligation to protect PHI and/or individually identifiable health information ("IIHI") is not changed or diminished by *AHA*; in fact, the decision reinforces virtually all aspects of the HHS Guidance and, more importantly, reinforces the notion that parents of minor patients, such as Plaintiffs in this case, who navigate Defendant's webpages have a reasonable expectation of privacy when they, among other things, (i) search for conditions and treatments related to their children's medical care, (ii) book an appointment for their children or (iii) access authenticated, non-public websites such as Defendant's patient portal. Defendant violated those privacy rights when it disclosed Plaintiffs' children's sensitive and private health information to third parties through the use and implementation of various tracking technologies. *See AHA*, 2024 WL 3075865 at *4, n.3 ("The Revised Bulletin contains an array of guidance for covered entities, much of which is both legally and pragmatically sound.").

Finally, multiple federal courts in the wake of the *AHA* decision have continued to find that information intercepted by tracking technologies on hospital websites can

constitute IIHI. For example, in *Smith v. Loyola University Medical Center*, the court held that because plaintiffs alleged that defendant intercepted their communications to violate HIPAA, defendant "cannot evade liability as a party to the communications under the ECPA." *See* 2024 WL 3338941, at *6-8 (N.D. Ill. July 9, 2024) (denying motion to dismiss ECPA & negligence claims where healthcare defendant used tracking technologies to collect IIHI in violation of HIPAA); *see also Cooper v. Mount Sinai Health Sys., Inc.*, 2024 WL 3586357, at *7 (S.D.N.Y. July 30, 2024) (denying motion to dismiss ECPA & common law claims where defendant was alleged to have collected IIHI in violation of HIPAA) (collecting cases); *Brahm v. Hosp. Sisters Health Sys.*, 2024 WL 3226135, at *5 (W.D. Wis. June 28, 2024) (similar under the Wisconsin Wiretap Act and numerous other causes of action).[5]

## III. PLAINTIFFS' COMPLAINT DOES NOT VIOLATE RULE 8.

Defendant next argues that Plaintiffs' Complaint violates Rule 8 because it "does not contain a short and plain statement" and includes "broadly defined terms." MTD at 8. While a claim for relief need include only "a short and plain statement of the claim," "no technical form" is required for pleadings and courts construe pleadings "so as to do justice." Fed.R.Civ.P. 8(a), (d)(1) & (e). Given the complexities of the various factual and legal matters involved in a case—particularly as it involves the use of tracking technologies to

[5] *See also Kane v. Univ. of Rochester*, 2024 WL 1178340, at *6 (W.D.N.Y. Mar. 19, 2024) (concluding that plaintiffs plausibly pled that use of tracking technology on unauthenticated appointment scheduling page shared IIHI to third parties); *In re Meta Pixel Healthcare Litig.*, 647 F. Supp. 3d 778, 791–93 (N.D. Cal. 2022) (finding that covered entity disclosed IIHI through tracking technology on patient portal navigation buttons on unauthenticated public website).

collect and to divulge Personal Information to third parties without consent—a lengthy complaint is necessary to explain the technology at issue, among other things. *See, e.g.*, *Bell v. Am. Accts. & Advisers, Inc.*, 2018 WL 6718573, at *4 (D. Minn. Nov. 15, 2018) ("The Court will not punish Bell or his counsel for adding sufficient facts, notwithstanding the legal conclusions contained therein, to withstand a possible Rule 12 challenge"). The purpose of Rule 8's pleading requirements is to "give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Swierkiewicz v. Sorema N. A.*, 534 U.S. 506, 512 (2002) (internal quotation marks omitted). Here, Plaintiffs' Complaint has provided the requisite level of notice to survive a Rule 8 challenge.

Defendant takes issue with the fact that the Complaint contains 237 paragraphs (totaling 72 pages) and thus—according to it—is not a "short and plain statement" and fails to put Gillette on notice of their claims. *Compare* MTD at 7-8, *with* Compl. ¶ 13. What Gillette does not mention are the technical complexities and novel nature of this case. Plaintiffs' Complaint requires 72 pages to outline the following: (a) how federal regulators have warned healthcare providers (like Gillette) about the impermissible use of tracking technologies (Compl. ¶¶ 21-27); (b) the technology behind the Meta Pixel (*id.* ¶¶ 28-61); (c) the technology behind Google Tracking Code (*id.* ¶¶ 62-64); (d) the specific third-party tracking technologies that Gillette deploys, including screenshots as evidence (*id.* ¶¶ 65-75); (e) Plaintiffs' specific experiences with Gillette (*id.* ¶¶ 76-105); (f) how Gillette's conduct violates its own privacy policies (*id.* ¶¶ 106-13); (g) why the exposure of Personal Information create a substantial risk of harm (*id.* ¶¶ 114-16); (h) the value of Plaintiffs' Personal Information (*id.* ¶¶ 117-34); (i) Plaintiffs reasonable expectation of privacy when

using Gillette's Website (*id.* ¶¶ 135-39); and (j) how Defendant's conduct violates HIPAA (*id.* ¶¶ 140-49).

Notably, and contrary to Defendant's argument, Plaintiffs' Complaint puts Defendant on notice of its impermissible conduct and the evidence Plaintiffs' have at this stage to support their claims. Plaintiffs' allegations support their causes of action and allow them to survive this motion to dismiss. Even where a complaint is long and contains many counts, it may be within the requirement of notice pleading. *See, e.g.*, *ASI, Inc. v. Aquawood, LLC*, 2020 WL 5913578, at *8 (D. Minn. Oct. 6, 2020) ("Although the Complaint is long and confusing and contains many counts, it is well within the requirement of notice pleading."); *Superior Edge, Inc. v. Monsanto Co.*, 44 F. Supp. 3d 890, 899 (D. Minn. 2014) (describing "Rule 8's liberal notice pleading requirements.").[6]

Defendant's remaining argument appears to be that the Complaint "uses broadly defined terms that lump allegations together" and "unfairly burdens" it and the Court. *See* MTD at 8. However, the two definitions that Defendant contends are problematic are those for "Personal Information" and "Tracking Tools." *Id.* With respect to Personal Information, the Complaint is clear that it includes PII and PHI. Compl. ¶ 1. Rather than being overly broad, the definition includes two parts and is set forth at the outset of the Complaint.

---

[6] The cases Defendant relies on are inapposite and readily distinguishable. MTD at 9-10. For example, in *Gurman v. Metro Housing & Redevelopment Authority*, the court relied on the fact that plaintiff filed seventeen claims by seven plaintiffs against thirteen defendants, creating confusion as to whose claims were brought against which defendant. *See* 842 F. Supp. 2d 1151, 1153 (D. Minn. 2011); *see also Chadbourne v. Walmart*, 2019 WL 4195269, at *2 (D. Minn. Aug. 8, 2019) (granting motion to dismiss where plaintiff did not file an opposition and the court could not identify a legal theory in the complaint).

Likewise, Plaintiffs' definition of "Tracking Tools" is third-party tracking technologies that Gillette used on its Website. *Id.* Not only are these tracking tools in Defendant's custody, but they are limited to what Defendant itself installed. These definitions are further permissible, as Plaintiffs may plead alternative theories of fact and liability. *See, e.g.*, *Prairie River Home Care, Inc. v. Procura, LLC*, 2018 WL 3621208, at *5 (D. Minn. July 30, 2018) ("Rule 8(d)(3) explicitly permits a party to state as many separate claims or defenses as it has, regardless of consistency.") (cleaned up).

## IV. PLAINTIFFS' CLAIMS SURVIVE A MOTION TO DISMISS.

### A. Plaintiffs Plausibly Allege an ECPA Claim.

Plaintiffs allege that Gillette violated the Electronic Communications Privacy Act ("ECPA"), which proscribes (a) the *interception* of Plaintiffs' electronic communications, (c) *disclosure* of Plaintiffs' electronic communications and (d) *using* the contents of those electronic communications. *See* Compl. ¶¶ 164-85; *see also In re Google Inc. Cookie Placement Cons. Priv. Litig.*, 806 F.3d 125, 135 (3d Cir. 2015) (listing the elements of an ECPA claim). In response, Gillette claims that the content of Plaintiffs' communications was not intercepted and its conduct falls within the statute's party exception. But in making these arguments, Gillette ignores and contradicts Plaintiffs' well-pled allegations and raises factual issues that are not appropriately resolved at this stage of the case.

#### 1. Plaintiffs Allege that Defendant Intercepted the Contents of their Communications.

Defendant first argues that the contents of Plaintiffs' communications were not intercepted. MTD at 10-12. Defendant claims that because it was a "party to a communication," it cannot unlawfully intercept that communication. MTD at 11. This is

not so. Defendant conflates the party exception to the ECPA with the meaning of contents and interception. As a party to the communication, the party exception *only* applies if Defendant's purpose in the interception was not to commit a crime or tort. *See, e.g.*, *Mekhail v. N. Mem'l Health Care*, 2024 WL 1332260, at *5 (D. Minn. Mar. 28, 2024) ("The crime-tort exception-to-the-[party] exception applies if a party intercepts a communication 'for the purpose of committing any criminal or tortious act in violation of the Constitution or laws of the United States or of any State.'") (citing 18 U.S.C. § 2511(2)(d)); *In re Grp. Health Plan Litig.*, 2023 WL 8850243, at *6 (D. Minn. Dec. 21, 2023) ("*Group Health*") (explaining the circumstances where the party exception does not apply). As explained further, the crime-tort exception applies in this case because Gillette, among other things, violated HIPAA and invaded Plaintiffs' privacy. *See infra* § IV(A)(2). Accordingly, Defendant, even as a party to the interception, can be held liable for its interception.

Additionally, the ECPA defines "contents" as "any information concerning the substance, purport, or meaning of [a] communication." *Mekhail*, 2024 WL 1332260, at *3 (citing 18 U.S.C. § 2510(8)). Defendant—intentionally or not—fails to appreciate the distinction between "record information," which is necessary to facilitate a communication, and the substantive content of the communication, which is "any information concerning the substance, purport, or meaning of [a] communication." *Doe v. Meta Platforms, Inc.*, 690 F. Supp. 3d 1064, 1076 (N.D. Cal. 2023) (quoting 18 U.S.C. § 2510(8)). A URL that discloses a "search term or similar communication made by the user" can be a communication under the statute. *Id.* (quotation omitted); *see also Mekhail*, 2024 WL 1332260, at *3 (explaining that "narrative search queries revealed via URLs

could represent "contents" under certain circumstances"). Notably, Defendant recognizes that two courts in Minnesota have rejected the exact argument it puts forward here—and yet asks for another bite at the apple. MTD at 12 (citing *Group Health*, 2023 WL 8850243, at *7 & *Mekhail*, 2024 WL 1332260, at *3)).

Here, Plaintiffs allege that their search queries, including those containing requests for appointments for their children and providers for their children's specific medical concerns, research regarding their medical conditions and symptoms, titles of the webpages they visited, and billing histories were disclosed to third parties. *See, e.g.*, Compl. ¶¶ 60, 73, 80, 82 & 95. This Personal Information is substantive, sensitive and confidential. Moreover, a review of the URLs Plaintiffs accessed makes it clear that they include medical search terms—in other words, the substantive content of the communication. *Id.* ¶¶ 81 & 96. The fact that Plaintiffs alleged the specific search queries they submitted on Defendant's Website and included URLs with content, therefore, constitutes contents of communications under the ECPA. *See Group Health*, 2023 WL 8850243, at *7 (explaining that content regarding plaintiffs' "symptoms, medical conditions, physician lookup, treatment, medication, and scheduling" is sufficient). Therefore, Plaintiffs sufficiently allege "content" information was intercepted and disclosed to third parties.

**2. The One-Party Exception Does Not Apply Because Plaintiffs Allege that Gillette Committed a Crime or Tort.**

Gillette also argues that it cannot be liable under the ECPA as a party to the communications because Plaintiffs' Complaint fails to allege the crime-tort exception

applies. MTD at 12-17. Where the crime-tort exception applies, the exception overrides the one-party consent rule:

> It shall not be unlawful under this chapter for a person not acting under color of law to intercept a wire, oral, or electronic communication where such person is a party to the communication … ***unless such communication is intercepted for the purpose of committing any criminal or tortious act*** in violation of the Constitution or laws of the United States or of any State.

18 U.S.C. § 2511(2)(d) (emphasis added). Criminal or tortious purposes may include "invading [plaintiffs'] privacy, defrauding her, or committing unfair business practices." *Deteresa v. Am. Broadcasting Cos., Inc.*, 121 F.3d 460, 467, n.4 (9th Cir. 1997) (cleaned up). Because the crime-tort exception applies, the fact that Gillette was a party to the communications does not shield it from liability.

#### a. Plaintiffs Allege a *Criminal or Tortious Purpose* to Violate HIPAA, the MUDTPA, and Commit an Invasion of Privacy.

First, Plaintiffs allege a criminal or tortious purpose. Courts interpret the crime-tort exception as requiring only "sufficient facts to support an inference that the offender intercepted the communication for the purpose of a tortious or criminal act that is *independent* of the intentional act of recording." *In re Google Inc. Cookie Placement Cons. Priv. Litig.*, 806 F.3d at 145 (emphasis in original) (quoting *Caro v. Weintraub*, 618 F.3d 94, 100 (2d Cir. 2010)). The crime-tort exception focuses on whether the purpose for the

interception—its intended use—was criminal or tortious. *See, e.g.*, *Desnick v. Am. Broad. Companies, Inc.*, 44 F.3d 1345, 1353 (7th Cir. 1995).[7]

Notably, "[t]he existence of a lawful purpose does not sanitize an interception that was also made for an illegitimate purpose." *In re Meta Pixel Healthcare Litig.*, 647 F. Supp. 3d at 796. Nevertheless, Defendant argues that "the crime-tort exception does not apply where the primary purpose for the alleged interception is based in financial gain." MTD at 14. However, the court in *Mount Sinai Health System* recently rejected this exact argument, explaining that "where a covered person intentionally disclosed patients' individually identifiable health information, HIPAA makes such a crime, and indeed imposes enhanced penalties when such was done for, *inter alia*, a "commercial advantage" or "personal gain." 2024 WL 3586357, at *9 (citing 42 U.S.C. § 1320d-6). There, the court rejected the cases that Defendant relies on here, recognizing that "none of the ECPA cases on which Mount Sinai relies in advancing this improbable theory involved alleged violations of HIPAA (or like statutes criminalizing disclosure of private information for commercial purposes)." *Id.*; *see also Mekhail*, 2024 WL 1332260, *5, n.4 (observing that it "defies common sense that a clearly harmful act could escape liability as long as it was done for profit"); *Kurowski v. Rush Sys. for Health*, 2024 WL 3455020, at *5 (N.D. Ill. July 18, 2024) (same). Ultimately,

[7] As this Court in *Mekhail* recognized, "the "primary motivation" or "determinative factor" test does not appear in the statute, which inquires only about a criminal or tortious "purpose" behind an interception. Nor does the test appear in any authority binding on this Court. Instead, it seems that the test originated in a 1986 case from the District of Massachusetts, which extrapolates from Eighth Circuit dicta and other sources to conclude that § 2511(2)(d) requires more than its plain language says it does." *See* 2024 WL 1332260, at *5 (citation omitted).

lawful purposes such as operating a website or having a profit motive do not insulate Gillette from liability because the use of tracking tools are not necessary to communicate with patients, provide medical care, or even operate a website (and cases to the contrary that Gillette identifies are outside this Circuit).

Here, Plaintiffs allege that Gillette intercepted their electronic communications for the purposes of violating HIPAA by collecting and disclosing their PHI and/or IIHI without consent thereby tortiously and criminally invading the privacy of Plaintiffs and the Class Members. *See, e.g.*, Compl. ¶¶ 176-81. Information is IIHI if it (i) is "created or received by" a health care provider and (ii) either "identifies the individual" or provides a reasonable basis to identify the individual. *Id.* ¶ 179 (citing 42 U.S.C. § 1320d-6). Judge Blackwell and this Court previously concluded that allegations that a healthcare defendant knowingly collects and transmits information that constitutes IIHI in violation of HIPAA for the purpose of financial gain are sufficient to invoke the exception-to-the-party-exception. *See Mekhail*, 2024 WL 1332260, at *5 ("Ms. Mekhail's complaint also invokes, albeit does not claim direct liability under, the federal Health Insurance Portability and Accountability Act, commonly known as HIPAA, the alleged violation of which has recently been found sufficient to invoke the crime-tort exception"); *Group Health*, 2023 WL 8850243, at *8 (relying on the allegation that the use "for marketing and revenue generation was in violation of HIPAA and an invasion of privacy").[8]

[8] *See also Rush,* 2024 WL 3455020, at *6(finding that plaintiff plausibly stated an ECPA claim and invoked the crime-tort exception by alleging violations of HIPAA arising out of the alleged interception); *Kane v. Univ. of Rochester*, 2024 WL 1178340, at *7 (W.D.N.Y. Mar. 19, 2024) (denying motion to dismiss ECPA claim where defendant violated HIPPA

As in *Group Health and Mekhail*, Plaintiffs here allege (i) when they began using Defendant's Website; (ii) the specific health conditions that they shared with Defendant (iii) and the actions they took on Defendant's Website including communicating with healthcare providers, researching their children's medical concerns and treatments, scheduling appointments and performing other tasks related to their children's medical inquiries and treatment. *See, e.g.*, Compl. ¶¶ 76-82 & 91-97. And Plaintiffs sufficiently allege that their Personal Information was received by Gillette and identifies or provides a reasonable basis to identify them.[9] *See id.* Thus, Defendant's independent violations of HIPAA are sufficient to invoke the crime-tort exception to the ECPA.

Further, Plaintiffs allege that Defendant's acquisition of patient communications that were disclosed to Meta and other third parties was done for the purpose of committing criminal and tortious acts in violation of the Minnesota Uniform Deceptive Trade Practices Act ("MUDTPA"). *See* Compl. ¶¶ 177 & 221-37; *see also infra* § IV(F). Plaintiffs also allege that Gillette committed the independent tort of invasion of privacy. *See* Compl. 186-99; *see also infra* § IV(B). In *R.C. v. Walgreen Co.*, the court held that where plaintiffs stated a claim for invasion of privacy, they have pled tortious intent for purposes of the ECPA. *See* 2024 WL 2263395, at *15 (C.D. Cal. May 9, 2024).

---

by receiving and then disclosing "information relating to the provision of health care that could reasonably identify that user"); *Mount Sinai Health Sys., Inc.*, 2024 WL 3586357, at *7 (same).

[9] Defendant does not dispute that either element of IIHI is met here.

**b. Plaintiffs Plead an *Independent* Tort or Crime.**

Despite clearly alleging that the criminal and tortious purpose for Defendant's unconsented interception of Plaintiffs' Personal Information was the separate and independent disclosure of that information to Facebook, Google and other third parties, Defendant argues that the crime-tort exception does not apply because the interception was not independent of the crime or tort." *Compare* Compl. ¶¶ 9-10, *with* MTD at 15-16. Defendant misunderstands the Complaint's allegations as Plaintiffs allege, at the time of interception Defendant intended to disclose Plaintiffs' Personal Information to third parties in violation of numerous laws and common law. *See, e.g.*, Compl. ¶ 177 ("[B]y embedding the Tracking Tools on its Website and disclosing the content of patient communications relating to Personal Information, without consent, Defendant had a purpose that was tortious, criminal, and designed to violate state and federal laws").

The cases Defendant cites to support its argument are inapposite and demonstrate that the unlawful disclosure here was indeed independent from the interception. For example, in *Caro*, plaintiff alleged that defendant intended to commit the tort of intrusion upon seclusion which "occurs through the simple act of the recording itself and therefore cannot satisfy the Wiretap Act's requirement of a separate and independent tortious intent." 618 F.3d at 101. And in *Planned Parenthood Federation of America, Inc. v. Newman*, 51 F.4th 1125, 1136 (9th Cir. 2022), plaintiffs did not allege disclosure as the criminal or tortious act, instead the court held that making recordings alone could not support both RICO and ECPA claims. *See* MTD at 15. Here, the independent unlawful disclosure

pleaded by Plaintiffs is a requirement to allege an invasion of privacy and a violation of HIPAA and the MUDTPA.

Moreover, the holding in *Okash v. Essentia Health* is an outlier in Minnesota. *See* 2024 WL 1285779, at *5 (D. Minn. Mar. 26, 2024) (granting motion to dismiss ECPA claim with leave to amend "to allow Okash to plead an independent connection to a tortious act, should one exist"). There, the court relied on an outdated analysis in *Kurowski v. Rush System for Health*, 683 F. Supp. 3d 836, 844 (N.D. Ill. 2023). But since then, the *Kurowski* court both held that plaintiff's amended complaint was "sufficient to invoke the HIPAA exception-to-the-party-exception" and denied a motion for judgment on the pleadings on the same issue. *See* 2023 WL 8544084, at *3 (N.D. Ill. Dec. 11, 2023) (granting leave to amend) & 2024 WL 3455020, at *6 (concluding "that Kurowski has plausibly alleged that Rush acted with the conscious desire to knowingly make unauthorized disclosures of her IIHI to Facebook, Google, and Bidtellect for purposes of invoking the crime-or-tort exception. As a result, Rush is not entitled to judgment as a matter of law on her Wiretap Act claim."). And even after *Okash*, the court in *Mekhail* concluded that plaintiff's "allegations sufficiently plead an interception made with the purpose of violating one or more laws, ***independent*** from the act of interception itself." 2024 WL 1332260, at *5 (emphasis added). Ultimately, Plaintiffs' allegations support the finding that Defendant's disclosure of Personal Information was separate and independent from its interception.

**c. Plaintiffs Allege a *Contemporaneous* Tortious or Criminal Purpose.**

Contrary to Plaintiffs' well-pled allegations, Defendant contends that Plaintiffs do not allege a contemporaneous tortious or criminal purpose. *Compare* Compl. ¶¶ 9, 56, 193 & 203. But Plaintiffs allege that Defendant purposely and intentionally installed the Meta Pixel and tracking technologies on its Website and concurrently intended to violate various laws by collecting and disclosing Plaintiffs' Personal Information without consent. *See* Compl. ¶¶ 3 & 29 (discussing intentional installation); *see also supra* § IV(2)(a). Plaintiffs also allege that "without any knowledge, authorization, or action by a user, a website owner like Defendant can use its Source Code to commandeer the user's computing device, causing the device to ***contemporaneously*** and invisibly re-direct the users' communications to Meta." *Id.* ¶ 56. And Plaintiffs explain how Defendant embedded the tracking technologies "to track and disseminate individual's communications with the Website for the purpose of marketing and advertising" and "to disclose and transmit to third parties Plaintiffs' and Class Members' communications with Defendant, including Personal Information and the contents of such information." *Id.* ¶¶ 193 & 203. Unlike the cases Defendant relies on, Defendant intentionally embedded the Pixel and had a criminal or tortious purpose at the time it intercepted Plaintiffs' communications.

**d. Plaintiffs Pled that Gillette *Intended to Harm* them.**

Plaintiffs allege that Gillette intended to harm them and their children through its non-consensual disclosure of their Personal Information. Gillette must have intercepted Plaintiffs' communication "with an intent to use that interception against the non-

consenting party in some harmful way." *Meredith v. Gavin*, 446 F.2d 794, 799 (8th Cir. 1971) (recognizing that the scope of conduct implicated by § 2511(2)(d) "must be determined on a case-by-case basis"). And Gillette did just that. As Plaintiffs allege, Defendant was aware that the exposure of their and their children's Personal Information creates a substantial risk of harm. *See, e.g.*, Compl. ¶¶ 114-16 (explaining how the FTC has issued, and regularly updates, guidelines for businesses to implement reasonable data security practices and incorporate security into all areas of the business); *see also id.* ¶ 194 (alleging that Defendant had notice and knew that its practices would cause injury to Plaintiffs and Class Members). Plaintiffs also allege that as a proximate result of Defendant's acts and omissions, the private and sensitive Personal Information of Plaintiffs and Class Members was disclosed to third parties without authorization, causing Plaintiffs and the Class ***to suffer damages***. *Id.* ¶ 195; *see also* ¶ 12 (listing the numerous injuries that Plaintiffs have suffered and will continue to suffer). Thus, the fact that Defendant intended to harm Plaintiffs is adequately pled.

### 3. Plaintiffs State a Claim for Procurement and Use.

Going further, Plaintiffs' Complaint supports their claim that Defendant's improper actions constitute "procurement" and "use" pursuant to the ECPA. *Compare* MTD at 17, *with* Compl. ¶¶ 166, 168 & 176. The ECPA provides that any person who "***intentionally uses, or endeavors to use,*** the contents of any wire, oral, or electronic communication, knowing or having reason to know that the information was obtained through the interception of a wire, oral, or electronic communication in violation of this subsection . . . shall be punished." *See* 18 U.S.C. § 2511(1)(d). As Plaintiffs have repeatedly alleged and

explained in this Opposition, Defendant intentionally used the contents of Plaintiffs' electronic communications with knowledge that they were intercepted to commit various crimes and/or torts, such as to violate HIPAA, the MUDTPA, and invade Plaintiffs' privacy. *See supra* §IV(A)(2); *see also* Compl. ¶ 176 ("Defendant also intentionally used or attempted to use the contents of Plaintiffs' and the Class Members' electronic communications, knowing that the information was obtained through interception."). Indeed, Gillette is liable under subsection 2511(1)(d), because: (i) Meta intercepted Plaintiffs' communications; (ii) Meta's interception of Plaintiffs' communications was unlawful; (iii) Gillette used the contents and product of Meta's interceptions; (iv) Gillette's use was intentional; and (v) Gillette knew Meta's interceptions were unlawful but used the contents from them anyway for its own commercial benefit.

Additionally, civil liability exists for procuring another to intercept communications. *See, e.g.*, *Lonegan v. Hasty*, 436 F. Supp. 2d 419, 428 (E.D.N.Y. 2006) ("[B]oth the person who actually intercepted the communications and the person who procured the interception have violated the Act, and the victim is authorized to sue any person or entity who engage in that violation."); *Valentine v. WideOpen West Finance, LLC*, 288 F.R.D. 407, 412 n.3 (N.D. Ill. 2012) (similar); *Boseovski v. McCloud Healthcare Clinic, Inc.*, 2020 WL 68578, at *6 (E.D. Cal. Jan. 7, 2020). Defendant's conduct falls squarely within the rule articulated in *In re Facebook, Inc. Internet Tracking Litigation*:

> Simultaneous, unknown duplication and communication of GET requests do not exempt a defendant from liability under the party exception. As we have previously held, the

> "paramount objective of the [Electronic Communications Privacy Act, which amended the Wiretap Act] is to protect effectively the privacy of communications." We also recognize that the Wiretap Act's legislative history evidences Congress's intent to prevent the acquisition of the contents of a message by an unauthorized third-party or "an unseen auditor." *See* S. Rep. No. 90-1097, reprinted in 1986 U.S.C.C.A.N. 2112, 2154, 2182. Permitting an entity to engage in the unauthorized duplication and forwarding of unknowing users' information would render permissible the most common methods of intrusion, allowing the exception to swallow the rule.

956 F.3d 589, 608 (9th Cir. 2020) (cleaned up); *see also United States v. Szymuszkiewicz*, 622 F.3d 701, 706 (7th Cir. 2010) (holding "the duplication and forwarding" of content violates the Wiretap Act). Here, Gillette procured Meta to intercept the contents of Plaintiffs' communications, which creates the same liability under the ECPA. *See, e.g.*, Compl. ¶¶ 3-7, 47-56 & 66-69. By procuring Meta, Gillette allowed, and in fact instructed, Meta to acquire swaths of federally protected patient data and aggregate, analyze, and process that data in a way that Gillette could use it to improve its own marketing and increase revenue. Gillette then actually used that data to send targeted ads. *Id.* ¶¶ 87 & 102.

**4. Factual Questions should not be Resolved on a Motion to Dismiss.**

Finally, whether Gillette had criminal or tortious intent is a factual question for discovery to be decided on the basis of a full evidentiary record. *See, e.g.*, *Group Health*, 2023 WL 8850243, at *7–8 ("[D]etermination of [defendant]'s actual purpose for . . . using the Pixel Code requires a factual undertaking."); *Kurowski v. Rush Sys. for Health*, 2023 WL 8544084, at *3 (N.D. Ill. Dec. 11, 2023). Precisely because Plaintiffs "may be able to show" that the crime-tort exception applies at a later, fact-intensive stage, courts have held that it is inappropriate to dismiss a suit at the pleading stage based on the single-party

consent defense. *See, e.g.*, *Doe v. Smith*, 429 F.3d 706, 709 (7th Cir. 2005) (even where defendant "obviously consented to the recording, [] that does not justify dismissing the suit. Complaints need not anticipate or attempt to defuse potential defenses").

**B. Plaintiffs Allege Invasion of Privacy Stemming from Defendant's Intrusive use of Tracking Technologies that are Highly Offensive to a Reasonable Person.**

Plaintiffs' well-pled allegations support their claim for invasion of privacy because Defendant's highly offensive installation of tracking technologies, such as the Meta Pixel, intruded upon Plaintiffs' seclusion and defeated their reasonable expectation of privacy. Under Minnesota law, an intrusion upon seclusion occurs where "[someone] intentionally intrudes, physically or otherwise, upon the solitude or seclusion of another or his private affairs or concerns … if the intrusion would be highly offensive to a reasonable person." *Group Health*, 2023 WL 8850243, at *2 (quoting *Lake v. Wal–Mart Stores, Inc.*, 582 N.W.2d 231, 233 (Minn.1998)). Because Plaintiffs have alleged both elements of intrusion upon seclusion, this Court should not dismiss their claim.

**1. Plaintiffs Allege that Defendant Committed an Intrusion.**

As an initial matter, Plaintiffs have alleged an intrusion occurred when Defendant affirmatively installed the Meta Pixel on its Website thereby enabling it to collect and unlawfully transmit Personal Information. *Compare* MTD at 18, *with, e.g.*, Compl. ¶¶ 192-93. In *In re Group Health Plan Litigation*, a Minnesota district court held that plaintiffs sufficiently alleged an intrusion when they claimed that defendant "deliberately integrated [the] Facebook pixel and CAPI into its Website and servers, which intercepted and shared communications with third parties, including Facebook." 2023 WL 8850243, at *3

(citations omitted). Here, Plaintiffs have similarly alleged Defendant's knowing and willful installation of the Meta Pixel on its Website—its affirmative act. *See, e.g.*, Compl. ¶¶ 1-3, 29, 176 & 194 (describing in detail how Defendant installed the tracking technologies).

The authorities that Defendant invokes to argue that the voluntary sharing of information cannot constitute an intrusion are distinguishable from the facts alleged in this case. *See* MTD. 18. Although Defendant's Website was public, Defendant secretly planted the Pixel on its Website for the purpose of recording Plaintiffs' Personal Information and transmitting it to third parties without informed consent or authorization. This is fundamentally different than the facts in *C.L.D.* and *Lehman*,[10] where the methods and reasons for collecting information or material at issue were known and authorized (and occurred in a markedly different digital environment), and the defendants there did not have a fiduciary duty to the plaintiffs.

Instead, this case is more akin to *Lake*, where plaintiff attempted to have a nude photograph developed at Walmart, and later learned that Walmart employees shared the photograph with others in the community. *See* 582 N.W.2d at 232-33. The trial court dismissed the case, but the Supreme Court of Minnesota reversed, holding that plaintiff adequately stated a claim for intrusion upon seclusion, appropriation, and publication of

---

[10] And Defendant's reliance on *Okash* is likewise misplaced. The court in *Okash* relied on the holding in *Lehman v. Zumbrota-Mazeppa Pub. Sch.,* 2005 WL 894756, at *4 (Minn. Ct. App. Apr. 19, 2005*)* without parsing out why the two cases are distinct. Even Defendant's own motion recognizes the inconsistency between the holdings in *Okash* and *Group Health*. *See* MTD at 19. Here, the essential element—that Defendant took affirmative steps to intrude on Plaintiffs' privacy—occurred. *Cf. Lehman*, 2005 WL 894756, at *4 ("[T]here was no affirmative act by respondents to obtain the information").

private facts. *Id.* at 235. It did not matter that plaintiff voluntarily provided Wal-Mart with her picture because it was done under false pretenses—she wanted her picture developed, not shared with others in the community without her knowledge. *Id.* Similarly, Plaintiffs here interacted with Defendant's Website for the purpose of seeking medical treatment—they did not know or authorize Defendant to share their Personal Information with third parties for commercial purposes. *See, e.g.*, Compl. ¶¶ 5, 10, 74-75, 81 & 95.

**2. Defendant's Conduct was Highly Offensive.**

The offensiveness of an intrusion turns on "the degree of intrusion, the context, conduct and circumstances surrounding the intrusion as well as the intruder's motives and objectives." *Kennedy v. City of Braham*, 67 F. Supp. 3d 1020, 1035 (D. Minn. 2014). In *In re Group Health*, the court held that plaintiffs sufficiently alleged highly offensive conduct after a healthcare entity transmitted sensitive information (not "vanilla, browsing history") such as medical diagnoses to third parties, such as Facebook. *See* 2023 WL 8850243, at *3. Moreover, the offensiveness of Defendant's conduct "is a question of fact for the jury, and becomes a question of law only if 'reasonable persons' can draw only one fact from the evidence." *Kennedy*, 67 F. Supp. 3d at 1035.

Here, Plaintiffs have plausibly alleged that Defendant's installation of the Meta Pixel is highly offensive to a reasonable person because of its invasive nature and the sensitivity of the information disseminated. To muddy the water, Defendant spends considerable time discussing "routine commercial behavior" and its cookie banner, but these arguments do not alter the conclusion that Defendant acted in a highly offensive manner. MTD at 19. Defendant relies on distinguishable out-of-circuit case law to support

its claim for "routine commercial behavior,". *Hammerling v. Google LLC* is inapposite because there, Plaintiffs did not allege that the collected data was personal. *See* 615 F. Supp. 3d 1069, 1091 (N.D. Cal. 2022). And in *In re Google, Inc. Privacy Policy Litigation*, Plaintiffs did not allege the collection of personal medical information, either on behalf of themselves or their children, unlike Plaintiffs in this case. *See* 58 F. Supp.3d 968 (N.D. Cal. 2014). For example, here Plaintiffs have alleged that their sensitive communications were disclosed, alongside other protected medical and Personal Information that Plaintiffs shared on behalf of their children. *See, e.g.*, Compl. ¶¶ 5, 80, 87 & 95. And Plaintiffs allege that they understood Defendant as acting in "some health-care related capacity," thereby entitling their data to protection. *Id.* ¶¶ 10 & 124.

Defendant's argument that its cookie banner warned Plaintiffs of the nature of their tracking technologies also fails. MTD at 19. Plaintiffs allege that Defendant's language surrounding its privacy promises was misleading and inaccurate. *See, e.g.*, Compl. ¶¶ 106-13. In particular, Defendant publishes Legal Notices that represent to patients and Website visitors that Defendant will keep sensitive information confidential and will only disclose Personal Information under certain circumstances, none of which apply here. *Id.* ¶ 107 (citation omitted). And Defendant's Privacy Policy represents that "cookies used by Gillette Children's do not collect any personal information about a visitor, provide any way to contact a visitor, or extract any information from a visitor's computer." *Id.* ¶ 109 (citation omitted).

Further, Plaintiffs have alleged Defendant's pecuniary and illegal motivations in its installation—that Defendant "knowingly transmitted this data and did so for the purpose

of financial gain." Compl. ¶ 175. And Plaintiffs likewise allege that Defendant's conduct violated HIPAA. *Id.* ¶¶ 146-49. Ultimately, Plaintiffs' allegations are akin to those in *In re Group Health* because they identify the sensitive Personal Information, such as medical treatment and diagnoses, sought for Plaintiffs' children through Plaintiffs' use of Defendant's Website. As such, Plaintiffs have adequately alleged that Defendant's conduct was intrusive and highly offensive to a reasonable person.

**C. Plaintiffs Plead all Elements of a Negligence Claim.**

Plaintiffs identify how Defendant had a duty to keep its patients' Personal Information confidential, Defendant breached its duty, and as a result Plaintiffs were harmed. A common law claim for negligence requires pleading the following elements: (i) the existence of a duty of care, (ii) breach, (iii) injury, and (iv) that the breach of Defendant's duty was the proximate cause of the injury. *See Group Health*, 2023 WL 8850243, at *6. While Defendant only contests three elements, Plaintiffs' well-pled allegations support their claim.

First, Defendant recognizes that it has a duty to protect its patients' Personal Information. MTD at 20 ("Gillette's duty is to its patients."); *see also* Compl. ¶ 201 (citing Minn. Stat. § 144.651 subd. 16). And in *In re Group Health Plan Litigation*, the court denied defendant's motion to dismiss the negligence claim and held that a duty of care exists. *See Group Health*, 2023 WL 8850243, at *6. Nevertheless, Defendant attempts to avoid responsibility by asserting that Plaintiffs—as parents of minor children—should not be able to assert that they were owed a duty when their children's Private Information was disclosed without consent by Defendants to unauthorized third parties. *Id.* (citing no cases

to support Defendant's argument). However, as previously explained, parents may bring suits to protect their children's medical rights. *See supra* § I (explaining that parents or guardians can sue to protect their children's medical rights). And Plaintiffs, as parents of Gillette's patients, can enforce the duty their children were owed on their behalf.

Second, Defendant breached its duty of care by disclosing a "health record" as defined in the Minnesota Health Records Act ("MHRA"). *See* Minn. Stat. § 144.291, subd. 2(c) (defining "health record"). According to the MHRA, a "health record" includes any information, whether oral or recorded, that relates in any way ***to past, present, or future mental or physical health*** of a patient. *Id.* (emphasis added). Although Defendant argues Plaintiffs' searches and browsing data do not constitute a "health record," MTD at 21, Minnesota courts have held that medical searches within a health provider's website and browsing data do constitute a "health record." *See Group Health*, 2023 WL 8850243, at *2 (stating that utilizing a healthcare website to "search for physicians; schedule appointments and procedures; receive and discuss medical diagnoses and treatment from healthcare providers; receive lab results; review medical records; review medical bills; and search symptoms and medical conditions relating to personal medical treatment" are sufficient to plead that health records were released to a third party without their consent).[11] Here, Plaintiff Harris used Defendant's Website to, among other things, research specialists, complete health assessments, and schedule appointments related to her daughter's disorder.

[11] *See also Doe v. Regents of Univ. of California,* 672 F. Supp. 3d 818, 818-19 (N.D. Cal. 2023) (stating plaintiff does not need to provide more specific medical details).

*See* Compl. ¶¶ 80-82.[12] And Plaintiff Braulick used Defendant's Website to research information related to her son's medical conditions and to schedule appointments with physicians related to her son's specific medical conditions. *See* Compl. ¶¶ 95-96. As such, Defendant's disclosure of sensitive medical information regarding patient's physical health as stated in the Complaint (and provided in more detail in the unredacted Complaint filed under seal) establishes that Defendant breached its duty.

Third, Plaintiffs successfully allege that they sustained cognizable injuries. *See* Compl. ¶ 206(a)-(g); *see also Hall v. Centerspace, LP*, 2023 WL 3435100, at *8 (D. Minn. May 12, 2023) (concluding that damages can include diminished loss of privacy). For example, in *In re Group Health Plan Litigation*, the court concluded that loss of privacy and diminished value of private information were recognized forms of injury. *See* 2023 WL 8850243, at *6. Courts nationwide also recognize injuries resulting from the loss of Personal Information. *See, e.g.*, *Calhoun v. Google LLC*, 526 F. Supp. 3d 605, 636 (N.D. Cal. 2021) (explaining that courts have begun to recognize the property value of personal information); *In re Anthem Inc. Data Breach Litig.*, 2016 WL 3029783, at *14 (N.D. Cal. May 17, 2016) (concluding that the loss of value of their personal information is a plausible injury). In this case, because Defendant shared Plaintiffs' children's PHI and the value of their Personal Information was diminished as a result, Plaintiffs' have a cognizable injury that is recognized throughout the country. *See, e.g.*, Compl. ¶¶ 90, 105, 196, 206(g) & 213.

[12] Plaintiffs filed a redacted complaint that details the specific medical conditions that their children suffered from and the treatment that Defendant provided, as well as their process of booking appointments. *See* ECF No. 1. In an interest of privacy, those specific details are not disclosed for the public in this Opposition.

And as already explained in detail, Plaintiffs also allege the invasion of their privacy that Defendant caused. *See supra* § IV(B). Accordingly, Plaintiffs have suffered an injury and Defendant's request to dismiss their negligence claim should be denied.

**D. Plaintiffs State a Claim for Breach of Implied Contract.**

To state a claim for breach of contract under Minnesota law, a plaintiff must allege facts showing (1) that a contract was formed, (2) the plaintiff performed any conditions precedent, (3) the defendant materially breached the contract, and (4) damages. *Gen. Mills Operations, LLC v. Five Star Custom Foods, Ltd.*, 703 F.3d 1104, 1107 (8th Cir. 2013). An implied-in-fact contract is a contract inferred from the circumstances and conduct of the parties. *Tri-State Bobcat, Inc. v. FINN Corp.*, 338 F. Supp. 3d 971, 982 (D. Minn. 2018).

Gillette moves to dismiss this claim on three grounds: (1) the Legal Notices state that Gillette may share data with third parties; (2) Plaintiffs fail to plead damages; and (3) Plaintiffs did not provide their "Personal Information." These arguments fail. First, the Legal Notices state unequivocally that Gillette will "not share voluntarily provided personal identifiable information for any purpose other than its intended use," Compl. ¶ 108, a promise Gillette violated when it disclosed substantive health information to Meta and Google along with Plaintiffs' unique identifiers. Second, Plaintiffs pleaded damages in the form of loss of the benefit of the bargain and diminution in value of Personal Information. *Id.* ¶¶ 90, 105, 117-134 & 213. No more is required. *Cf. Group Health*, 2023 WL 8850243, at *4 (denying motion to dismiss breach of contract claim where plaintiffs alleged "the loss of the benefit of their bargain and diminution in value of Private

Information"). Third, because Plaintiffs themselves are considered the "patients" of Gillette, the information disclosed constitutes their "Personal Information." *See supra* § I.

Several courts, including in this District, have concluded that substantially similar facts give rise to a claim for breach of implied contract. *See, e.g.*, *Group Health*, 2023 WL 8850243, at *4 (denying motion to dismiss breach of contract claim in healthcare pixel case); *Doe v. Tenet Healthcare Corp.*, 2024 WL 1756075, at *4 (D. Mass. Apr. 23, 2024) (same); *see also Regents of Univ. of California*, 672 F. Supp. 3d at 821 (finding it "plausible that the parties entered into an implied contract by their actions," with the "agreed upon terms of this implied contract [being] spelled out in the Notice of Privacy and Privacy Statement, providing assurances"). For similar reasons, Gillette's motion to dismiss the breach of contract claim should be denied.

**E. Plaintiffs Properly Allege Unjust Enrichment.**

An unjust enrichment claim is pleaded by alleging "(1) a benefit conferred; (2) the defendant's appreciation and knowing acceptance of the benefit; and (3) the defendant's acceptance and retention of the benefit under such circumstances that it would be inequitable for him to retain it without paying for it." *Christensen L. Off., PLLC v. Ngouambe*, 2018 WL 2293423, at *6 (Minn. App. May 21, 2018). Claims for unjust enrichment focus "on what the person allegedly enriched has received, not on what the opposing party has lost," *Georgopolis v. George*, 54 N.W.2d 137, 142 (Minn. 1952).

Defendant raises contentions regarding the alleged benefit conferred and whether Defendant's retention of the benefit without payment was unjust.[13] Both are properly pled.

Plaintiffs allege that a benefit was conferred on Defendant through its use of the Personal Information that Defendant intercepted from Plaintiffs, which provided Defendant with "economic, intangible, and other benefits, including substantial monetary compensation." Compl. ¶ 217. Courts in this District find these allegations sufficient to maintain unjust enrichment claims. *See Mekhail*, 2024 WL 1332260, at *13 (observing that "assertions about the value of [plaintiffs'] data … as well as allegations about the ways that data was deployed to [defendant's] benefit … sufficiently allege that a benefit was conferred").[14] Here, Plaintiffs assert the exact type of conferred benefit that has repeatedly been held to sustain an unjust enrichment claim. *See, e.g.*, Compl. ¶¶ 37–43 (value of data), 16, 19–20 & 28 (benefit to Defendant).

Plaintiffs also allege that the retention is unjust because it is inequitable for Defendants to retain benefits from the use of Personal Information that Plaintiffs did not know was being intercepted. Defendant mistakes a caselaw reference to "uncompensated" benefits as shielding defendants who provide *any* thing of use to a plaintiff. MTD at 24.

---

[13] Defendant also reiterates its conclusory contentions regarding the existence of an implied contract and whether Plaintiffs can maintain an action for the sharing of their children's health information. These arguments carry no more weight here than in their original sections. *See supra* §§ I & IV(D). In any event, the existence of an implied contract is a question for the trier of fact. *See Stubbs v. North Mem'l Med. Cntr.*, 448 N.W.2d 78, 82 (Minn. Ct. App. 1989).

[14] *See also Okash,* 2024 WL 1285779, at *7 (distinguishing case that did not allege monetary benefit); *In re Group Health Plan Litigation*, 2023 WL 8850243, at *4.

This is incorrect, and Defendant's provision of provider communications and general research services does not provide carte blanche to profit from Plaintiffs' clandestinely intercepted health data without compensation.[15] *See Roth v. Life Time Fitness, Inc.*, 2017 WL 1628877, at *3 (D. Minn. May 1, 2017) (defendant avoids unjust enrichment by paying "dollar-for-dollar for what it got," not by paying any amount) (quoting *ServiceMaster of St. Cloud v. GAB Bus. Servs., Inc.*, 544 N.W.2d 302, 306 (Minn. 1996)). Plaintiffs allege that they were not informed that the Personal Information was being disclosed to third parties, and therefore never could have intended or agreed that any benefit Defendant provided to Plaintiffs was in exchange for that disclosure.

Finally, Defendant cannot sidestep Plaintiffs' allegations concerning its unauthorized disclosures. Plaintiffs allege their expectation of healthcare privacy and that Defendant's disclosure of Personal Information exceeds what was described in its Legal Notices. Compl. ¶¶ 34–36 & 43–48. Defendant's conclusory argument to the contrary attempts to hand-waive away the central dispute in this case, which is improper at this stage. *See Mekhail*, 2024 WL 1332260, at *14 ("[T]the Court again declines to explore the contours of the privacy policy at this stage.").

---

[15] Defendant also cites a case in which Personal Information was *hacked* as purportedly analogous to this case in which Defendant *intentionally disclosed* Personal Information. MTD at 24 (citing *Hall v. Centerspace, LP*, 2023 WL 3435100 (D. Minn. May 12, 2023). The alleged inequities are nothing alike. This case does not concern whether the costs of "greater data protection" to safeguard against unknown hackers was part of the bargain. *Id.* at *7.

### F. Plaintiffs Properly Allege Violation of the MUDTPA.

The MUDTPA provides that a person "likely to be damaged by a deceptive trade practice of another may be granted an injunction against it." Minn. Stat. §325D.45, subd. 1. To assert a claim under the MUDTPA, Plaintiff must "allege an irreparable injury or threat of future harm." *Knotts v. Nissan North America, Inc.*, 346 F.Supp.3d 1310, 1328 (D. Minn. 2018).[16] A complaint "pass[es] Rule 12(b) muster" by alleging deceptive practices that are not found "non-deceptive as a matter of law." *Minnesota ex rel. Hatch v. Fleet Mortg. Corp.*, 158 F.Supp.2d 962, 967 (D. Minn. 2001). Plaintiffs clear the Rule 12 plausibility standard by pleading that they were reasonably deceived by a healthcare provider's representations that it would not disseminate private health information.

#### 1. Plaintiffs plausibly allege deceptive statements.

Defendant, a medical provider, omitted the fact that it was disclosing Personal Information to third parties and misrepresented to Plaintiffs that Defendant "is strongly committed to protecting the privacy of its online users[, including] patients, families"; "We do not share voluntarily provided, personally identifiable information for any purpose other

---

[16] Defendant notes that a heightened pleading standard applies to MUDTPA claims but does not challenge the particularity of Plaintiffs' pleading; any such argument is forfeited or waived. *See, e.g.*, *Chey v. Metro. Airports Comm'n,* 2023 WL 2308272, at *3 (D. Minn. Mar. 1, 2023) (finding waiver where no authority or argument was included). Regardless, Plaintiff sufficiently alleges *who* (Defendant, Compl. ¶¶ 2, 16 & 106–113); *what* (misrepresentations and omissions concerning Defendant's protection of Personal Information, *e.g., id.* ¶¶ 106–113 & 226); *when* (2019–present for Mrs. Braulick and 2022–23 for Mrs. Harris, *id.* ¶ 76–77 & 91); *where* (Defendant's Website and the state of Minnesota, *id.* ¶¶ 14–15 & 107); and *how* (Defendant's use of tracking technology allowed Personal Information to be transmitted to third parties without Plaintiffs' knowledge or consent, *e.g., id.* ¶¶ 4–10 & 225–27).

than its intended use"; "We do not rent or sell visitors' personal information to third parties, such as marketers"; "cookies used by Gillette Children's do not collect any personal information about a visitor"; and that its use of Pixel technology is "to count users who have visited those pages or opened an e-mail and for other related Sites statistics." Compl. ¶¶ 108–110 & 226. It is more than plausible that a reasonable visitor to the Website would be deceived into believing that Defendant was safeguarding Personal Information—as it stated that it would do and as is required under well-known laws—rather than freely disclosing Personal Information to third parties. *See* Compl. ¶¶ 83–84 & 98–99.

Defendant cites a case finding that a reasonable consumer would not interpret the words "Biologically Appropriate" to mean "made from all fresh ingredients, does not contain any amount of heavy metals or BPA, and is processed in such a way as to eliminate any risk that it could be contaminated with pentobarbital." *Song v. Champion Petfoods USA, Inc.*, 2020 WL 7624861, at *3 (D. Minn. Dec. 22, 2020). *Song* only emphasizes the reasonability of Plaintiffs' interpretation of Defendant's representations. While the *Song* plaintiffs' interpretation was held to "attribute an awful lot to an innocuous, two-word phrase," the Plaintiffs here simply took a medical provider's statements that it would protect Personal Information, as it is legally required to do, at face value. *Id.* at *5. It was reasonable to do so.

**2. Plaintiffs allege a causal nexus.**

Plaintiffs allege that they would not have provided Personal Information to Defendant or paid for Defendant's services if Defendant had not misrepresented and

omitted its disclosure of that Personal Information to third parties. *See, e.g.*, Compl. ¶¶ 90, 105, 227, 231–32 & 234–35. This sufficiently alleges the required causal nexus.

This is not a case, as in *Luckey v. Alside, Inc.*, 245 F. Supp. 3d 1080, 1098 (D. Minn. 2017), that lacks "factual allegations about who heard or saw and relied on [defendant's] sales statements and when."[17] Here, Plaintiffs allege that omissions and misrepresentations published by Defendant were seen by Plaintiffs and thereby directly caused harm. And Plaintiffs identify those omissions and misrepresentations. Compl. ¶ 108. Defendant takes issue with Plaintiffs' interpretation of Defendant's omissions and misrepresentations—claiming, for example, that Plaintiffs should have gleaned from Defendant's disclosure of using Pixels "to count users who have visited those pages or opened an e-mail" that Defendant would use the Pixels to illegally transmit protected Personal Information to third parties. MTD at 26. This argument "is essentially asking the Court to make factual determinations about the effect that the Privacy Policy had (or ought to have had) on [Plaintiffs], weighing [Defendant's] interpretation of its meaning and import against hers." *Mekhail*, 2024 WL 1332260 at *8. But that is not "[t]he Court's role at this stage …. Instead, the Court must accept all facts alleged by [Plaintiffs] and draw all reasonable inferences in [their] favor." *Id.*

[17] *Luckey* involved a window manufacturer that "sold windows to developers, contractors, and/or subcontractors who built Minnesota homes" that were eventually, at some point, purchased by the plaintiffs. *Id.* at 1084.

**3. Plaintiffs allege that they are likely to suffer future harm.**

The MUDTPA provides injunctive relief for a "personal likely to be damaged by a deceptive trade practice." Minn. Stat. § 325D.45, subd. 1. For injunctive relief, Article III standing requires allegations that the plaintiff "faces a threat of ongoing or future harm." *Park v. Forest Serv. of U.S.*, 205 F.3d 1034, 1037 (8th Cir. 2000); *see also Barclay v. Icon Health & Fitness*, 2020 WL 6083704, at *2 (D. Minn. Feb. 17, 2022) (MUDTPA and Article III requirements are "indistinguishable"). At the Rule 12 stage, a plaintiff need only "allege facts sufficient to support a likelihood of future harm." *Hudock v. LG Elecs. U.S.A., Inc.*, 2017 WL 1157098, at *6 (D. Minn. Mar. 27, 2017).

Plaintiffs continue to face a likelihood of future harm in two ways. First, they face imminent harm through ongoing use of the Personal Information that Defendant has already intercepted. *See, e.g.*, Compl. ¶¶ 12 & 206; *see also Group Health*, 2023 WL 8850243 at *10 ("Plaintiffs do allege future harms" of "continued and ongoing risk of harassment, spam, and targeted advertisements" due to "information [they] communicated to Defendant"); *Okash,* 2024 WL 1285779 at *6 ("Injunctive relief may also help remedy ongoing harms from the already-collected data"); *Mekhail,* 2024 WL 1332260 at *10 (this harm "gets at a more tangible and immediate threat"). They additionally face the risk of future harms because Plaintiff Braulick continues to need to access Defendant's Website in connection with medical care and Plaintiff Harris may be required to do so, either to access further medical care or to review medical records. *See Mekhail*, 2024 WL 1332260 at *9 (noting that patient may be forced to interact with hospital again "despite her best efforts"). While Defendant argues that Plaintiffs are by now aware of its deceptive practices, "it

would defang all aspects of public interest embodied in the deceptive trade statutes to the point of futility" if individuals deceived by a business were required to establish that they are likely to be deceived again. *Id.* at *10. It would be "a wholly unrealistic result" for the legislature to provide a private right of action for individuals who could never establish standing to pursue that right. *Le v. Kohls Dep't Stores, Inc.*, 160 F.Supp.3d 1096, 1110 (E.D. Wis. 2016); *see also Barclay*, 2020 WL 6083704 at *5 n.2 (explaining that defendant's argument on this point was "better directed to whether Plaintiffs are entitled to injunctive relief on the merits, not whether they have standing").

**4. Plaintiffs' MUDTPA claim is not moot.**

In its unverified motion, demonstrating no evidence for the Court to consider, attaching no affidavit on the point, and without ever admitting that it engaged in the practices in the first place, Defendant claims that it "has stopped the practices complained of," and that this should moot Plaintiffs' claim. MTD at 28–29. Even if taken as true that it has paused its unlawful conduct, a defendant cannot "moot a case simply by ending its unlawful conduct once sued. … Otherwise, a defendant could engage in unlawful conduct, stop when sued to have the case declared moot, then pick up where he left off." *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 91 (2013). Under the voluntary cessation doctrine, a defendant "bears the formidable burden of showing that it is absolutely clear the allegedly wrongful behavior could not reasonably be expected to occur." *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 191 (2000). Defendant has attempted no such showing. Defendant can reenable the tracking technologies as easily as they were

disabled and has the same marketing incentives to do so now as it did at the outset of its tracking.[18] Plaintiffs' claim is not moot.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that this Honorable Court deny Defendant's motion to dismiss in its entirety, grant leave to amend to address any pleading deficiencies and award all such other relief as equity and justice require.[19]

Dated: August 8, 2024

Respectfully Submitted

*s/Hart L. Robinovitch*

Hart L. Robinovitch (MN Bar No. 0240515)
Ryan J. Ellersick*
14648 North Scottsdale Road, Suite 130
Scottsdale, AZ 85254
Telephone: (480) 348-6400
hart.robinovitch@zimmreed.com
ryan.ellersick@zimmreed.com

David S. Almeida*
Elena A. Belov*
**ALMEIDA LAW GROUP LLC**
849 W. Webster Avenue
Chicago, Illinois 60614
Telephone: (312) 576-3024
david@almeidalawgroup.com
elena@almeidalawgroup.com

**Pro Hac Vice*

*Attorneys for Plaintiffs & the Putative Class*

[18] This underscores Plaintiffs' standing to seek a court-ordered injunction. Given Defendant's previous misrepresentations regarding Personal Information, unless they obtain an injunction with the force of law Plaintiffs will continue to be harmed because they "have no way of knowing in the future" if Defendant will protect their Personal Information. *In re Gen. Mills Glyphosate Litig.*, 2017 WL 2983877, at *4 (D. Minn. July 12, 2017).

[19] Leave to amend should be freely granted. *See, e.g.*, *Meyer v. Rahn*, 2024 WL 1242236, at *1 (D. Minn. Mar. 22, 2024) (citing Fed. R. Civ. P. 15(a)(2)).